Filed 12/17/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LAURIE WOODS, | B307220 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC697649) |
| v. | |
| AMERICAN FILM INSTITUTE, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County. Daniel J. Buckley, Judge. Affirmed.

Setareh Law Group, Shaun Setareh and Thomas Segal for Plaintiff and Appellant.

Akin Gump Strauss Hauer & Feld, Gary M. McLaughlin, Aileen M. McGrath, Jonathan P. Slowik and Victor A. Salcedo for Defendant and Respondent.

_____

Laurie Woods appeals from an order denying certification of a class of persons who worked without pay for respondent American Film Institute (AFI). Since 1987, AFI has presented an annual film festival in Los Angeles (the Festival) for which it uses volunteer workers. Woods contends that those volunteers were actually employees because AFI is not permitted to use unpaid labor under California law. Woods filed a putative class action alleging that such workers were therefore denied benefits that California employers are required to provide to employees, such as minimum and overtime wages, meal and rest breaks, and wage statements.

The trial court denied class certification on the ground that common issues would not predominate over individual ones. The court reasoned that a worker cannot be classified as an employee unless the worker expects some compensation. Determining whether any particular class members expected compensation would therefore require separate, individual mini-trials. The court also found that whether AFI had an unlawful meal and rest break policy that it uniformly applied to its workers could not be determined through common proof.

We affirm based upon the trial court's first reason for denying certification. The trial court correctly decided that putative class members who expected no compensation were not employees under California law. The class that Woods moved to certify is broad enough to include persons who expected to be paid. Thus, if the case were to proceed as a class action, the trier of fact would need to decide whether each class member expected to be paid or was in fact a volunteer. The trial court acted within its discretion in finding that the need to decide such individual issues would preclude common issues from predominating.

2

## BACKGROUND

### 1. Woods' Allegations

Woods's operative First Amended Complaint (Complaint) alleges that AFI has solicited thousands of volunteers to work at its Festival "under the false pretense that volunteers will get to enjoy the event in exchange for their services."  In reality, the volunteers are required to work and do not have an opportunity to attend the event.  Thus, the volunteers "do not receive any compensation for their 'employment' and in many cases incur expenses for which they have not been reimbursed by [AFI]."

The Complaint alleges that the volunteers' hours are controlled by a volunteer manager, and that the volunteers are typically asked to arrive earlier and stay later than their assigned shift.  AFI imposes requirements such as a mandatory orientation and a minimum number of shifts that volunteers must work.  The Complaint alleges that "[b]ecause volunteers were expected to, and in fact did, spend the vast majority of their time performing job duties under [AFI's] direction, supervision and control, the promise of free admission was illusory."

Woods claims that she worked as a volunteer at the Festival for four days in November 2017.  She alleges that she worked between 12 and 14 hours each of those days.  She claims that members of the putative class regularly worked more than eight hours per day and more than 40 hours per week.

The Complaint asserts claims for unpaid wages, unpaid overtime, missed meal and rest periods, failure to reimburse expenses, and failure to provide wage statements.

### 2. Woods's Class Certification Motion

Woods filed a motion seeking certification of a class consisting of "[a]ll persons who worked at the AFI Festival from

March 20, 2014 through the date of class certification who were not paid for their work."  In support of the motion, Woods submitted declarations from a number of volunteer workers and provided evidence concerning AFI's agreements with Festival sponsors.

The volunteers described their hours of work and their job responsibilities.  The volunteers' jobs included tasks such as ushering guests, handing out tickets and ticket forms, answering phones, controlling lines for events, working in the box office, and running errands.  Several of the declarants testified that they worked longer than eight hours per day on occasion.  None of the volunteers were paid, and none testified that they expected payment.

Evidence concerning the Festival sponsors showed that AFI received tens of thousands of dollars each from movie studios and film producers as well as sponsorship contributions from companies such as Coca-Cola, American Airlines, Dolby, and others.  In return, AFI agreed to show the producers' films, coordinate events surrounding the screenings and after parties, and provide transportation using vehicles from the event's automotive sponsor.  AFI also agreed to acknowledge the corporate donors as sponsors and to recognize their sponsorship in various ways at the events.

Woods's motion claimed that AFI is not a charitable organization that is permitted to use volunteers under California law.  Rather, Woods asserted that AFI's Festival simply "operates as a marketing operation for the film industry."  Woods argued that the question whether AFI could lawfully use volunteers for the Festival was itself an "overarching common issue that will determine the claims of the class."

4

In opposition, AFI argued that common questions would not predominate over individual issues for the claims that Woods sought to certify. AFI argued that Woods was wrong in claiming that AFI is precluded from using volunteer labor. AFI provided evidence that it is a tax-exempt, nonprofit organization dedicated to the film industry. AFI claimed that, as such, it is permitted to use volunteers under California law, and that individual members of the class would therefore have a claim only if they expected to be paid as employees. AFI argued that proving such an expectation by particular class members would require individual proof. AFI also argued that Woods failed to show that AFI uniformly applied an unlawful break policy to class members and failed to provide any common means to determine which class members worked more than eight-hour days for purposes of Woods's overtime claim. Finally, AFI claimed that Woods was not a proper class representative.

### 3. The Trial Court's Ruling

The trial court denied certification on the ground that "any common questions present here are inundated and overwhelmed by the litany of unmanageable individualized inquiries that would be necessary to establish AFI's liability to any putative class member." The trial court rejected Woods's argument that AFI was not permitted to use volunteers under California law. The court reasoned that "both employment and independent contractor relationships always contemplate an expectation of monetary compensation in exchange for services rendered." In particular, the definitions in the wage order that governs working conditions in the motion picture industry "overwhelmingly support an interpretation of 'work' that interposes a threshold requirement that the 'employee' . . . expects at least some level of

5

monetary compensation." The court concluded that, under Woods's interpretation of the law, "volunteerism in California would grind to a halt overnight."

The trial court concluded that, because workers are not employees unless they expect compensation for their services, determining whether particular class members were actually employees would create individual issues that would dominate the trial. "[E]ach individual class member would be required to testify that they did, or did not, expect payment in return for their services provided during the AFI film festival. This would splinter any potential class action into hundreds of individual trials."

The trial court also found that Woods had failed to provide evidence of an unlawful meal and rest period policy that AFI uniformly applied to the class. The court explained that Woods alleged only that AFI had no *written* meal and rest period policy. However, the evidence showed that AFI had an "unwritten policy encouraging and authorizing volunteers to take as many meal and rest breaks for however long they wanted . . . . Thus, individualized inquiries permeate and overwhelm Plaintiff's meal and rest period claims." The court also found that individual proof concerning the hours that each class member worked would be unmanageable.

In light of these findings, the trial court did not reach AFI's argument that Woods was not a proper class representative.

## DISCUSSION

1. **Standard for Class Certification and Standard of Review**

A lawsuit may proceed as a class action "when the question is one of a common or general interest, of many persons, or when

6

the parties are numerous, and it is impracticable to bring them all before the court." (Code Civ. Proc., § 382.) To certify a class, "[t]he party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) The community of interest factor in turn has three requirements: (1) common questions of fact or law that predominate over individual issues; " ' "(2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Ibid.*)

Where, as here, the class certification requirement at issue is predominance, the trial court must determine whether " 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Brinker, supra,* 53 Cal.4th at p. 1021, quoting *Collins v. Rocha* (1972) 7 Cal.3d 232, 238.) To answer this question, a court must "examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible." (*Brinker*, at pp. 1021–1022.)

In addition to deciding whether common issues predominate, a court considering class certification must determine whether the remaining individual issues can be resolved "fairly and efficiently." (*Duran v. U.S. Bank National*

7

*Assn.* (2014) 59 Cal.4th 1, 28–29.) "In considering whether a class action is a superior device for resolving a controversy, the manageability of individual issues is just as important as the existence of common questions uniting the proposed class." (*Id.* at p. 29.)

Our review of the trial court's class certification ruling is "narrowly circumscribed." (*Brinker, supra,* 53 Cal.4th at p. 1022.) We review the trial court's ruling only for abuse of discretion. " 'A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.' " (*Id.* at p. 1022, quoting *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089 (*Fireside*).)

**2.  The Trial Court Acted Within Its Discretion in Denying Certification of the Proposed Class**

**a.  *The trial court properly considered legal issues necessary to decide whether class certification was appropriate***

Class certification is a procedural issue separate from the merits of the plaintiff's case. Thus, "resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided [citation], with the court assuming for purposes of the certification motion that any claims have merit." (*Brinker, supra,* 53 Cal.4th at p. 1023.) However, "[w]hen evidence *or legal issues* germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them." (*Id.* at pp. 1023–1024, italics added.) Indeed, "[t]o the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them." (*Id.* at p. 1025.) If resolution of an issue

8

concerning the merits is necessary to decide class certification, the court's review should be limited to " 'those aspects of the merits that affect the decisions essential' to class certification." (*Id.* at p. 1024, quoting *Schleicher v. Wendt* (7th Cir. 2010) 618 F.3d 679, 685.)

Here, the dispositive legal issue is whether AFI could lawfully use volunteer workers for its Festival. The issue in dispute is even narrower. Woods does not dispute that workers may volunteer for some types of nonprofit organizations without becoming employees under California law. The parties also agree that a person who works for such a qualifying nonprofit might actually be an employee if that person expects to be paid. Thus, the parties disagree only on the question of whether AFI falls within the category of nonprofit organizations that may lawfully use volunteer labor.

Consideration of that issue was essential for deciding class certification. Only by determining the applicable legal standard could the trial court decide whether the issue of liability was amenable to resolution through common proof.

As mentioned, Woods sought to certify a class consisting of "[a]ll persons" who worked at the Festival "who were not paid for their work." If Woods is correct that AFI may *not* use volunteer labor under California law, then the question whether class members were employees could be answered on a common basis because each class member was entitled to compensation whether or not they expected to be paid.

However, the converse is not true. If AFI is correct that it may properly use voluntary labor, it would not be liable to class members who expected no compensation. But the class is defined more broadly than such persons. The proposed class of persons

9

"who were not paid for their work" includes persons who did not expect to be paid as well as any class members who *expected* payment but did not receive it. The persons who expected payment might be entitled to compensation as employees. The trial court reasonably concluded that whether particular class members expected payment would need to be resolved through individual proof that would predominate over common issues.

Woods claims that this is a manufactured issue. She explains that she "made clear that she did not intend to argue that either she, or anyone else who worked at the AFI [Festival] expected to be paid." She argues that the legal issue of whether AFI could use volunteers was therefore itself a common issue that the trial court should have deferred to the merits stage of the litigation. Woods's theory is apparently that, if she did not *claim* that any class members expected payment, the trial court could ignore the possible individual issues and the case could be resolved on the common legal issue alone.

However, the relevant question is not what Woods intended to argue but rather what persons the class contains. If a class were certified and the case were litigated to resolution, class members who were given notice and did not opt out would be bound by the outcome. (See *Fireside, supra,* 40 Cal.4th at p. 1083.)[1] Unless the individual expectations of class members

_____

[1] Indeed, the rule that members of a certified class are bound by the outcome of the lawsuit is the reason for the principle that the class certification ruling should precede a decision on the merits whenever possible. (*Fireside, supra,* 40 Cal.4th at p. 1081.) Doing so prevents the problem of " ' " 'one-way intervention,' " ' " where class members may " ' " 'elect

10

were considered at trial, class members who actually expected payment would see their claims extinguished if AFI prevailed. The trial court properly rejected the invitation to ignore the individual interests of unnamed class members.[2]

Thus, the trial court's ruling that individual issues would predominate was reasonable if some class members actually expected payment and therefore might be considered employees.

Neither party provided any evidence on the question whether the class *in fact* included persons who expected to be paid. Each of the putative class members who submitted declarations in support of certification identified himself or herself as "a former employee" of AFI. Each explained their job duties and each testified that they were not paid. However, none stated whether they expected compensation.[3]

---

whether to join in the action depending upon the outcome of the decision on the merits.' " ' " (*Ibid.*, quoting *Green v. Obledo* (1981) 29 Cal.3d 126, 146–147.)

[2] Doing so might have made class certification inappropriate for other reasons. If Woods simply abandoned the claims of unnamed class members, she may not have been an adequate representative. (See *Evans v. Lasco Bathware, Inc.* (2009) 178 Cal.App.4th 1417, 1432 ["A proposed representative must adequately represent the class, and a trial court may conclude that requirement is not met if the class member 'fail[s] to raise claims reasonably expected to be raised by the members of the class' "], quoting *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 464.)

[3] AFI provided a declaration from Michael Lumpkin, Director of AFI Festivals, stating that "[t]o AFI's knowledge, no volunteer besides Laurie Woods (when she filed this lawsuit) has

Despite the absence of direct evidence, there was a reasonable basis for the trial court's implicit finding that the class included persons who expected payment. First, as mentioned, the class definition included all persons who worked at the AFI Festival and who did not *receive* payment, regardless of their expectations. Based on this definition, the class might include persons with a variety of intentions, including those who freely volunteered; those who were promised compensation; and those who believed that they would receive some compensation based upon particular communications or other individual circumstances of their work.[4]

---

ever demanded payment for volunteering. Rather, AFI's understanding is that volunteers know that they are helping the organization without pay." Lumpkin's statement about the state of mind of all AFI volunteers may fairly be characterized as speculative. His statement that "to AFI's knowledge," no volunteer had ever demanded compensation could support an inference that volunteers generally did not expect compensation. But Lumpkin did not describe the basis for "AFI's knowledge." And, even if true, the lack of any demand for payment of wages does not foreclose the possibility that some class members expected some form of compensation that they did not receive. Especially in light of Woods's own case theory (described below), this evidence did not preclude the trial court from reaching a reasonable conclusion that the class might contain persons who expected compensation.

[4] Whether a particular class member was actually an employee might depend upon factors in addition to an expectation of payment. But whether or not such an expectation of payment was *sufficient* to establish an employment relationship, under AFI's interpretation of the governing legal standard it was

12

Second, Woods's own allegations support the conclusion that the class included persons who expected compensation. Regardless of what Woods intended to argue at trial, the theory of her Complaint is that volunteers were duped into working for AFI through promises of valuable compensation in the form of event passes that they were never actually given the opportunity to use. The Complaint alleges that AFI solicited volunteers "under the false pretense" that they would get to enjoy the event. The Complaint further alleges that AFI misrepresented the value of admission to the events, "such that Plaintiff and members of the putative class reasonably believed such compensation would have value commensurate with the value of the services rendered to Defendants."

Such allegations of promised compensation, if proved, might support contract or estoppel theories of employment. As our Supreme Court has explained, the employment relationship is fundamentally contractual, "meaning it is governed in the first instance by the mutual promises made between employer and employee. [Citations.] The promise to pay money in return for services rendered lies at the heart of this relationship." (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1148 (*Voris*).) However, "[e]ven in the absence of an explicit promise for payment, the law will imply one, and thus authorize recovery, when circumstances

necessary. (Cf. *Talley v. County of Fresno* (2020) 51 Cal.App.5th 1060, 1083 (*Talley*) ["The existence of remuneration alone does not prove an individual is an employee . . . , but the lack of remuneration precludes such a finding"].) Thus, individualized proof would be required to determine at least if class members expected compensation, and perhaps to determine other characteristics of employment as well.

13

indicate that the parties understood the employee was not volunteering his or her services free of charge." (*Ibid.*)

Third, Woods bore the burden to establish the "community of interest" requirement, including the need to show " ' "predominant common questions of law or fact." ' " (*Brinker, supra,* 53 Cal.4th at p. 1021.) The trial court was permitted to consider the " 'theory of recovery' " described in Woods's own Complaint in assessing whether Woods had met that burden. (*Id.* at pp. 1021–1022.) That theory suggested that individual class members might have claims that they were employees based upon their own expectations in agreeing to work for AFI. Thus, the trial court properly considered the governing legal standard in concluding that common issues would not predominate at trial.

Quoting *Hall v. Rite Aid Corp.* (2014) 226 Cal.App.4th 278, Woods argues that "at the class certification stage, as long as the plaintiff's theory of liability is *amenable* to resolution on a classwide basis, the court should certify the action for class treatment *even if* the plaintiff's posited theory is ultimately incorrect at its substantive level." (*Id.* at p. 293.) In *Hall*, the court concluded that a class could be certified despite a dispute between the parties concerning the proper interpretation of the rule governing the employment practice at issue.[5] However, in that case, the court concluded that common issues would predominate regardless of which party's interpretation of the

---

[5] The interpretation issue was whether section 14 of Wage Order No. 7-2001—which requires an employer to make seats available to employees depending on the nature of the work—should be analyzed based on an employee's job as a whole or in relation to specific common tasks.

14

governing standard was correct. (*Id.* at pp. 294–295.) As discussed above, that is not the case here. Thus, unlike in *Hall*, Woods's theory of liability here was *not* amenable to resolution on a classwide basis.

### b. *The trial court correctly found that class members were not employees if they did not expect compensation*

To determine whether common issues would predominate, the trial court needed to analyze the applicable law only to the extent of deciding whether AFI was precluded from using volunteer labor as a matter of law. If so, then the legal standard would not be an impediment to deciding liability on a common basis, because each member of the class would theoretically be entitled to compensation.[6] However, if AFI was not precluded from using volunteer labor as a matter of law, then the trial court would need some mechanism for determining whether individual class members were volunteers or employees.

The trial court correctly concluded that AFI was not precluded from using volunteer labor as a matter of law. The trial court's reasoning was broad. As mentioned, the trial court concluded that "both employment and independent contractor relationships *always* contemplate an expectation of monetary compensation in exchange for services rendered." (Italics added.)

---

[6] Even if the legal standard permitted proof on a classwide basis that class members were employees, other obstacles to certification might remain, such as the trial court's alternative findings concerning individual issues associated with proof of lost wages and missed meals and breaks. Because of our disposition, we need not consider these other potential obstacles.

There is some support in the cases for this general conclusion. As explained above, our Supreme Court has stated that the "heart" of the contractual employment relationship is the "promise to pay money in return for services rendered." (See *Voris, supra,* 7 Cal.5th at p. 1148.) In addition, several Courts of Appeal have decided that the receipt of compensation is a threshold requirement for a person to be considered an employee under the California Fair Employment and Housing Act (FEHA, Gov. Code, § 12900 et seq.). (See *Talley, supra,* 51 Cal.App.5th at p. 1083 ["[t]he common law factor analysis utilized by federal and California courts alike, in the context of the FEHA and other similar antidiscrimination statutes, considers remuneration a dispositive threshold factor to determine whether an individual *may* qualify as an employee"]; *Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 637 (*Mendoza*) ["compensation of some sort is indispensable to the formation of an employment relationship"]; *Estrada v. City of Los Angeles* (2013) 218 Cal.App.4th 143, 151 (*Estrada*) [same].)

However, we need not decide whether the trial court was correct in suggesting that the expectation of compensation is a necessary condition to be an employee in *all* contexts. We need only consider whether persons may volunteer for an organization such as AFI without becoming employees.

### i. *Volunteers for nonprofit entities are not employees*

The Labor Code does not provide a direct answer to the question whether the minimum standards that protect employees under California law must be extended to those who volunteer their time for nonprofit organizations. The article of the Labor Code that governs the payment of wages defines the terms

16

"wages" and "labor," but does not define "employee." (See Lab. Code, § 200.)[7] Section 1194—which establishes the right for "any employee receiving less than the legal minimum wage or the legal overtime compensation" to sue for the unpaid balance—also "does not define the employment relationship nor does it specify who may be liable for unpaid wages."[8] (*Flowers v. Los Angeles County Metropolitan Transportation Authority* (2015) 243 Cal.App.4th 66, 74.)  Rather, as discussed further below, "[s]pecific employers and employees become subject to the minimum wage requirements only through and under the terms of wage orders promulgated by the [Industrial Welfare Commission (IWC)], the agency formerly authorized to regulate working conditions in California." (*Ibid.*)

But the Labor Code does contain several analogous provisions supporting the conclusion that volunteers for nonprofit entities are not employees for purposes of the wage and hour rules.  For example, California's "prevailing wage law" (§ 1720 et seq.) is a minimum wage provision that applies to those employed on "public works." (*Busker v. Wabtec Corp.* (2021) 11 Cal.5th 1147, 1153.)  This law was among those adopted during the Great Depression to "ensure that workers employed on public building programs would be paid daily wages commensurate with

---

[7] Subsequent undesignated statutory references are to the Labor Code.

[8] Section 1194 applies "[n]otwithstanding any agreement to work for a lesser wage."  Woods cites this provision as support for the proposition that the right to be paid the minimum wage cannot be waived.  But the section cannot reasonably be read to prohibit *volunteer* labor.  An agreement to work "for a lesser wage" is not an agreement to work for no wage.

17

those prevailing in the local area for work of a similar character." (*Id.* at p. 1155.) Like California's wage and hour provisions, the prevailing wage law is intended to prevent employers from taking unfair advantage of workers. One of the law's goals is to " 'protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas.' " (*Id.* at p. 1156.)

Section 1720.4 states that the prevailing wage law does not apply to "[a]ny work performed by a volunteer." (§ 1720.4, subd. (a).) A volunteer is a person "who performs work for civic, charitable, or humanitarian reasons for a public agency or corporation qualified under Section 501(c)(3) of the Internal Revenue Code as a tax-exempt organization, without promise, expectation, or receipt of any compensation for work performed." (*Ibid.*)

Similarly, section 3352 excludes volunteers from the scope of the workers' compensation law. That section defines "employee" to exclude any "person performing voluntary service for a public agency or a private, nonprofit organization who does not receive remuneration for the services, other than meals, transportation, lodging, or reimbursement for incidental expenses." (§ 3352, subd. (a)(9).)

Finally, as discussed above, cases have also interpreted "employee" for purposes of the FEHA to exclude volunteers. (See *Mendoza, supra,* 128 Cal.App.4th at p. 629 [volunteer community service officer for a city]; *Estrada, supra,* 218 Cal.App.4th at p. 145 [volunteer municipal police reserve officer].)

In addition to these analogous statutory provisions, the language, history, and purpose of the IWC wage orders also support the conclusion that persons may volunteer for nonprofit

18

entities without becoming employees.  Wage order 12 (Wage Order), the relevant wage order here, governs wages, hours, and working conditions in the motion picture industry.  (See Cal. Code Regs., tit. 8, § 11120.)[9]  The Wage Order defines "employee" simply as "any person employed by an employer."  An employer is one who "directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person."  And "employ" means to "engage, suffer, or permit to work."  (Wage Order, subds. (2)(D), (2)(E) & (2)(F).)  These definitions are included in all IWC wage orders governing California industries.  (*Dynamex, supra,* 4 Cal.5th at p. 926, fn. 9.)

Our Supreme Court interpreted this wage order language in *Martinez v. Combs* (2010) 49 Cal.4th 35 (*Martinez*).  In that case, the court considered whether produce merchants who contracted with a strawberry farmer could be considered employers of the farmer's workers.  (*Id.* at pp. 42–44.)  The court explained that California's wage orders were the result of legislation passed in 1913 that created the IWC in the context of "widespread public recognition of the low wages, long hours, and poor working conditions under which women and children often labored."  (*Id.* at p. 53.)  The " 'suffer, or permit to work' " language in the wage orders was adopted from language in use

___

[9] "In California, wage orders are constitutionally authorized, quasi-legislative regulations that have the force of law." (*Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, 914, fn. 3 (*Dynamex*).  We analyze the meaning of the Wage Order *de novo.*  (*Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36, 44.)

throughout the country to reach "irregular working arrangements" for employing child labor. (*Id.* at pp. 57–58, 69.) The language means that a "proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so." (*Id.* at p. 69.)

The definition of " 'employer' " as one who " 'exercises control' " over wages, hours, or working conditions "by its terms imposes liability on multiple entities who divide among themselves control over those different aspects of the employment relationship." (*Martinez, supra,* 49 Cal.4th at p. 67.) Combined with the term "engage," "[t]o employ, then, under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Id.* at p. 64.)

Thus, the history of the definitions of "employ," "employee," and "employer" in the Wage Order suggests that the Wage Order was meant to apply to persons who are working for pay in commercial businesses. The "suffer or permit to work" and "exercises control" standards extend responsibility to businesses who benefit from and have the power to prevent exploitation of workers who are working for compensation. And the term "engage" reaches businesses that form an express or implied contractual relationship to compensate persons whom they hire.

The purpose of the work standards in the IWC wage orders also suggests that those standards apply to businesses who employ workers for pay. In *Dynamex,* our Supreme Court

20

explained that the "exceptionally broad suffer or permit to work standard in California wage orders finds its justification in the fundamental purposes and necessity of the minimum wage and maximum hour legislation in which the standard has traditionally been embodied. Wage and hour statutes and wage orders were adopted in recognition of the fact that individual workers generally possess less bargaining power than a hiring business and that workers' fundamental need to earn income for their families' survival may lead them to accept work for substandard wages or working conditions. The basic objective of wage and hour legislation and wage orders is to ensure that such workers are provided at least the minimal wages and working conditions that are necessary to enable them to obtain a subsistence standard of living and to protect the workers' health and welfare." (*Dynamex*, *supra*, 4 Cal.5th at p. 952.)[10]

In addition to protecting workers, the wage orders help to ensure a level playing field among competitors. Industry-wide wage orders "are also clearly intended for the benefit of those law-abiding businesses that comply with the obligations imposed by the wage orders, ensuring that such responsible companies are not hurt by unfair competition from competitor businesses that

---

[10] As Woods correctly observes, the decision in *Dynamex* concerned the standard that applies in determining whether workers should be classified as employees or as independent contractors for purposes of the IWC wage orders. (*Dynamex*, *supra*, 4 Cal.5th at pp. 913–914.) While the opinion in that case is relevant to the proper interpretation of the definitions in the wage orders, it does not bear directly on the specific issue here, i.e., whether volunteers for nonprofits should be considered employees under California law.

utilize substandard employment practices." (*Dynamex, supra,* 4 Cal.5th at p. 952.) Finally, the minimum work standards in wage orders help to protect the public from the need to assume responsibility for the "ill effects to workers and their families resulting from substandard wages or unhealthy and unsafe working conditions." (*Id.* at p. 953.)

All three of these factors—protecting workers from exploitation; protecting businesses from unfair competition; and protecting the public from the need to assist workers who were compelled to labor for substandard pay or in substandard conditions—apply to businesses that employ *paid* labor. They do not apply to persons who intend to volunteer their time to nonprofit entities.

The language of the Wage Order also supports the interpretation that it applies to persons who work for compensation. The Wage Order states that it "shall apply to all persons employed in the motion picture industry, including extra players, teachers, and welfare workers, *whether paid on a time, piece rate, commission, or other basis.*" (Cal. Code Regs., tit. 8, § 11120, subd. 1, italics added.) The reference to the *mode* of payment suggests an assumption that the workers subject to the Wage Order are working for pay. The same language appears in the section defining the scope of the Labor Code chapter governing wages and working conditions. (See Lab. Code, § 1171 ["The provisions of this chapter shall apply to and include men, women and minors employed in any occupation, trade, or industry, *whether compensation is measured by time, piece, or otherwise*"], italics added.)

Importantly, the Division of Labor Standards Enforcement (DLSE) has also concluded that the IWC wage orders do not

apply to volunteers who work for nonprofits.[11]  In 1988, the DLSE issued an opinion letter (Opinion Letter) explaining that, for purposes of the IWC work orders, a person who works for a "religious, charitable, or similar nonprofit corporation" is not an employee if he or she "intends to volunteer his or her services for public service, religious, or humanitarian objectives, not as an employee and without contemplation of pay."  (See <https://www.dir.ca.gov/dlse/opinions/1988-10-27.pdf> [as of Dec. 9, 2021], archived at <https://perma.cc/FWP6-5B33>.) However, if a person works for a *commercial* enterprise operated by such a religious, charitable, or nonprofit corporation (such as a restaurant or thrift store), the DLSE considers that person to be an employee.  (*Ibid.*)[12]  The DLSE has incorporated this opinion into its Enforcement Policies and Interpretations Manual (Dec. 2018, § 43.6.7, p. 43-6).  (See <https://www.dir.ca.gov/dlse/ DLSEManual/dlse_enfcmanual.pdf> [as of Dec. 9, 2021], archived at <https://perma.cc/SSY3-YTKN>.)

---

[11] "The DLSE is the administrative agency authorized to enforce California's labor laws, including applicable wage orders." (*Dynamex, supra,* 4 Cal.5th at p. 945, fn. 18.)

[12] The DLSE's opinion letters, while not controlling on the courts, " ' " ' "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." ' " ' " (*Brinker, supra,* 53 Cal.4th at p. 1029, fn. 11, quoting *Seymore v. Metson Marine, Inc.* (2011) 194 Cal.App.4th 361, 369, fn. 5.)  "A court may adopt the DLSE's interpretation if the court independently determines that the interpretation is correct."  (*Oliver v. Konica Minolta Business Solutions U.S.A., Inc.* (2020) 51 Cal.App.5th 1, 27.)

### ii.    *Woods's arguments are unpersuasive*

Woods does not dispute that some nonprofit organizations may use volunteer labor.  However, she argues that AFI is not included in the scope of such organizations because it is not a religious or charitable organization.  Woods argues that only organizations dedicated to helping the poor or the " 'needy or suffering' " fall within the category of charitable organizations that may use volunteers according to the Opinion Letter.

The language in the Opinion Letter is not so limited.  The letter refers to volunteers working for "public service, religious, or humanitarian objectives" in a "religious, charitable, or *similar nonprofit organization*."  (Italics added.)  Woods acknowledges that this language is apparently derived from section 1720.4.  That section defines "volunteers" more directly as those who work for "civic, charitable, or humanitarian reasons for a public agency or corporation *qualified under Section 501(c)(3) of the Internal Revenue Code as a tax-exempt organization*."  (Lab. Code, § 1720.4, subd. (a), italics added.)  There is no dispute here that AFI is a tax-exempt, Internal Revenue Code section 501(c)(3) organization.

Other than her strained interpretation of the DLSE Opinion Letter, Woods does not provide any support for her argument that only organizations serving the needy may use volunteers under California law.  Consider the implications.  Under Woods's interpretation, local community theatre organizations, community orchestras, and other cultural nonprofit entities would be required to treat all their workers as employees, even if those workers were dedicated to the mission of the organization and wished to volunteer their time.  Such a rule would have unforeseen and potentially devastating financial

24

implications for such groups. Woods's interpretation lacks any legal support or policy justification, and we reject it.

Woods also argues that AFI does not qualify to use volunteers because it is not organized for a "humanitarian" purpose. In essence, Woods claims that AFI is not a bona fide nonprofit arts organization but simply exists to promote the films that it screens and the studios and production companies that make them.

But Woods did not provide any evidence to support that theory. Woods does not dispute that AFI is qualified as a tax-exempt nonprofit. Nor did she provide any evidence that AFI engaged in promotional or marketing activities that were inconsistent with its tax-exempt status.[13] She points only to evidence that AFI receives money for its Festival from various corporate sponsors and from companies who produce the films that it screens.

Such evidence is not sufficient to show that AFI is a commercial promotional entity rather than a qualifying nonprofit. Again, consider the implications. Under Woods's theory, a publisher's contributions to a book fair or a musical

---

[13] To the contrary: The contracts between AFI and the Festival sponsors that Woods submitted in support of her class certification motion suggest that AFI sought to remain within the bounds of promotional conduct that was permitted for an Internal Revenue Code section 501(c)(3) organization. Sponsors agreed that, in recognition of AFI's tax-exempt status, "AFI's name and AFI Marks . . . cannot be utilized without written authorization by AFI and will not be utilized so as to create the impression that AFI is endorsing, or is otherwise promoting, Distributor or its products as such an endorsement or promotion could jeopardize AFI's tax exempt status."

25

instrument company's donations to a music festival might preclude the use of volunteers for those events. And any payments by a commercial entity in return for sponsor recognition would likewise force such events to use paid employees only. Woods provides neither legal nor factual support for her argument that AFI must be treated as a commercial business entity for purposes of its obligations to its workers.

We need not, and do not, decide the obligations of such commercial entities. We note the DLSE's opinion that charitable entities may not use volunteers when they operate commercial enterprises suggests that the DLSE interprets the IWC wage orders to apply to all persons working in commercial ventures. (Opinion Letter, p.1.) The Opinion Letter does not explain the reason for this interpretation. Presumably it reflects a concern that commercial employers could take advantage of workers who agree to forgo pay in the hope of securing future paid employment or other career benefits.

Woods argues that the demand for career opportunities in the film industry creates just such a concern. Other courts have considered similar concerns in the context of deciding whether unpaid interns should be considered employees. (See, e.g., *Glatt v. Fox Searchlight Pictures, Inc.* (2d Cir. 2015) 811 F.3d 528, 535 (*Glatt*) ["employers can . . . exploit unpaid interns by using their free labor without providing them with an appreciable benefit in education or experience"].)

Whether this concern is sufficient to justify treating unpaid interns or other volunteers in commercial businesses as

employees may be subject to debate.[14]  But we do not find it compelling here.  AFI is not a for-profit commercial business. Consistent with the DLSE's Opinion Letter, we hold only that persons may volunteer for nonprofit entities, including arts organizations such as AFI, without becoming employees under California law.

---

[14] For example, the Fair Employment and Housing Council has issued a regulation defining " '[u]npaid interns and volunteers' " for purposes of the FEHA which concludes that "[u]npaid interns and volunteers may or may not be employees." (Cal. Code Regs., tit. 2, § 11008, subd. (k); see also *Glatt, supra,* 811 F.3d at pp. 531–532, 536–537 [applying a test to determine whether interns at a film production company were employees in which the lack of expectation of payment was only one factor among others]; *Benjamin v. B&H Educ., Inc.* (9th Cir. 2017) 877 F.3d 1139, 1146–1147, 1150 [predicting that the California Supreme Court would likely apply the same multi-factor test under California law]; but see *Mendoza, supra,* 128 Cal.App.4th at p. 636 [citing with approval a federal decision that an unpaid intern "did not meet the definition of employee for common law agency"]; *Talley, supra,* 51 Cal.App.5th at p. 1082 [2014 amendments to the FEHA extending some protections to "unpaid student interns and other volunteer work situations" did not mean that such unpaid workers are employees]; *Kao v. Holiday* (2017) 12 Cal.App.5th 947, 957 [suggesting in dicta that a "nonemployee trainee" might not be subject to California wage and hour laws].

## DISPOSITION

The trial court's order denying class certification is affirmed. American Film Institute is entitled to its costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.